Good morning, Your Honors. May it please the Court, my name is Ward Talliff. I appear today on behalf of Appellant Brendan Retz appealing the order of the Bankruptcy Court denying his discharge. The appeal really involves two key issues, the first of which is, did the bankruptcy judge err in finding that Brendan Retz had the requisite intent to defraud, hinder, or delay a creditor? And the second is, was there a requisite finding that he failed to adequately explain or justify the absence or loss of any assets or property? With respect to the — And are those all factual conclusions to which we apply the clearly erroneous standard of review? I believe that would be correct, Your Honor. And under the circumstances, did you say Talliff? Is that the way you said it? Yes, Your Honor. Mr. Talliff, I — it's rare that we see a 135-page memorandum opinion from a bankruptcy judge and a 40-page opinion from the BAP that sustains the findings against your client. And as Judge Tallman indicated, these are almost entirely factual issues. Since that's the case, your burden is extremely high to try to overcome this. Since we only have a relatively short period of time and you've got pages and pages and pages of claims about these, what are your two best factual arguments where you just claim that these — that the lower court was just wrong? The first is that although there are factual arguments and there are factual issues, I believe Judge Kirscher applied the wrong standard as to those facts. With respect to the — And the bankruptcy judge and the BAP disagreed with you, did they not? They did. But that was before the Khalil decision came out by the Ninth Circuit, too. And in that decision, the Ninth Circuit said that in and of itself, a false oath is not evidence or sufficient to — sufficient to sustain a finding that the debtor acted fraudulently or knowingly. But we have a minor part. That's a minor part of the thing. I'm sorry. That's a minor part. Fraudulently? That's not the only reason why the bankruptcy judge denied a discharge. Well, in fact, Judge, if you — I'm sure you've read the opinion. And I agree. It's not often you get a 135-page opinion. And if I did get one, I would have liked to have been on the other side of it. But then the same with the — With the BAP. But it seems to me that the key in Judge Kershaw's opinion is at least in two places where he says unequivocally, in and of itself, filing those schedules under oath without having read them or seen them was sufficient to justify a finding of fraud, of acting fraudulently. But there was much, much, much more to this case. So if they're not following on Judge Pias's point, I mean, this is a — I don't know your client. I know nothing about him other than what shows up in the record here. But this looks like just a massive, pervasive attempt to avoid paying obligations that under the bankruptcy code he owed. Am I wrong about that? I learned a long time ago never to tell a judge he or she was wrong. But I would say yes in this instance. And perhaps because I know my client and perhaps because I know the other counsel that were involved, that I'm convinced that in order to find this pervasiveness that Judge Kershaw seemed to believe existed, you had to believe that not only Brendan Retz had an intent to defraud creditors, but that his attorney, Harold Dye, had such an intent that his attorney was measured. But that's not quite common, with no offense to any of these parties at all, because I don't know any of them at all. But, I mean, you look at the Madoff situation. You look at the scads of pyramid schemes and so on going on these days. All of the attorneys are involved, pretty much. They're involved in the same thing. The attorney of the — what was the lady's name? Mrs. Astor in New York. I mean, the fact is, if you've got somebody working together in a complicated situation, the fact that an attorney is involved is not particularly shocking to me. It's not nice. I'm not happy about it. But I guess what I'm struggling with here, I appreciate you doing your job. You're a fine lawyer. I have empathy for anybody that has been wronged in this, your client or anybody else. But the record is so replete, again and again and again, that individual things themselves that would have been enough to create a problem are just — they're there in spades. The judge — wasn't there enough evidence that the judge could have simply looked at the aggregate, the cumulative effect of it and said, hey, this is too much? I think he still has to find the requisite intent. And if he can't find that, then he's entitled to his discharge. And I would go back to the advice of counsel that there is no evidence in this record that any transaction that Brendan Retz engaged in wasn't disclosed and discussed with his attorneys. And to their credit, and at some risk, frankly, they came to court and testified about that. And as an attorney in Montana and as a member of our Commission on Practice, which oversees ethical violations, if I believed those attorneys had acted to participate in a fraudulent scheme, and, in fact, if my opposing counsel had believed that, we are obligated to report that. And it wasn't done here. I didn't see — I didn't see Judge Kirshner going quite that far. I didn't see anywhere in his opinion where he actively accused Mr. Dye or anyone else of having aided and abetted Mr. Retz in what he did. But that's sort of beside the point. You had said that Khalil would have mandated a different result here. And I'd like to draw your attention to, I guess it's page 175 of the Bankruptcy Report or Volume 379, where the panel talks at some length about a finding of fraud where the debtor first supplies incomplete information to the bankruptcy court, and then notwithstanding multiple opportunities to correct it and take advantage of opportunities to clear up inconsistencies or omissions, he fails to do so. And the panel says that that can be found to constitute reckless indifference to the truth, satisfying the requisite finding of intent to deceive. Isn't that what this record shows? Well, it says — if I recall the exact wording of the case, it also says it can be probative of intent. I didn't — Well, I just read you exactly what we wrote there. It's pretty clear to me what it says, and it seems to me that that pretty accurately fits the situation here where your client had many, many months, including up to and through the time of trial, to supply the information that was missing and failed to do so. And, again, I can't deny that in the record. I can only point out what I've said in my briefs and all along, is he did that on the advice of counsel. I wish his counsel had not been so combative. He had an absolute obligation to work with the trustee, and he didn't do it. Well, without laying it off on the lawyer, I don't understand how what Judge Kirshner found is inconsistent with the recitation of the law that I just read you from Khalil, which was decided after Judge Kirshner ruled. Well, what I would point out to you, Judge, is on the — on page 119 of Judge Kirshner's ruling, where he makes a statement, By advising his client not to amend his schedules in a statement of financial affairs before trial of this adversary proceeding, thy effectively precluded any analysis by the court of the debtor's bad faith or prejudice to creditors, or whether the amendments cured the allegations of Abbey's second amended complaint since no amendments exist in the record before the court to consider. That, to me, indicates that had Brendan not gotten the advice that we're not going to amend these schedules, Judge Kirshner would have considered that as probative evidence of his intent. Well, let's say that's correct, counsel. We hear cases all the time where people blame their lawyers for things they did and didn't do wrong. And sometimes they're right and sometimes they're wrong. But it sounds like you're almost advocating a standard that if ultimately what the lawyer advocated doesn't work out well and you get a new crack at it. And we can't have that. I mean, that's not our system, is it? No, no. And I hope I'm not advocating that at all. What I'm trying to say, though, the distinction between this case and Adib and Beauchamp is that — and cases of the like — is that in this case, the attorney came in and wrote that, in fact, he did give that advice and the intent wasn't to defraud, delay, or hinder a creditor. In those other cases, it was held that the debtor admitted that they knew the effect would be to — to hinder or defraud or delay a creditor, and the attorney knowingly participated in it. And either that or the attorney didn't come in and testify that they hadn't given the advice. That's the distinction I see in this case, Your Honor. Well, what about your client — the findings of fact included incidents like, you know, selling the helicopter, running up a $50,000 line of credit on property that he previously transferred to his brother the day after he filed the petition. You're not suggesting that Mr. Dye had anything to do with that, are you? Well, I'm suggesting — I'm not suggesting. I'm saying the record is clear that he talked with Harold Dye about that before he undertook either of those transactions. Including fully disclosing to him that he was about to take out a $50,000 line of credit on a piece of property that he no longer owned title. I believe that is in the record, that that discussion — Where would I find Mr. Dye's admission that he told him to do that? I don't have that at hand. I'm sorry, Your Honor. I didn't see it. Okay. Well, I'll do my best to try and find it during the counsel's argument. Even if he did advise him of that, it's pretty clear that those things were clear violations of fraudulent transfer acts, the bankruptcy code and the like, is it not? I would have thought so, at least potentially. It would have raised red flags. But Van Dye said no. It's all right to do. And he gave Brendan reasons for it. I understand that. But, you know, say he was misinformed. Say he didn't understand the law. The fact that someone does that, it doesn't mean that they go to jail necessarily, but they may not get a bankruptcy discharge because the bankruptcy code is set up in a way that if you play by the rules, then you can get a discharge. And what the court below found here was that your client, whether or not advised by counsel, didn't play by the bankruptcy rules, didn't play by the fraudulent transfer rules. And as a result, he's not entitled to the discharge. So whether the attorney advised him or not, isn't that really what we're stuck with here? Well, forgive me, but I'm going to sound like a broken record because the cases all say that you have to find each of those elements. You can't conflate them. You have to find knowing. You have to find fraudulent. And if he acted on advice of counsel in good faith, then he lacks that requisite fraudulent intent. And that's our position, that he explained every one of these transactions to Van Dyke. I understand, looking at them from a distance, they are suspicious. They may be beyond suspicious, but there's no evidence in the record that he believed or understood them to be improper. Your client was convicted of criminal offenses arising out of some of this conduct, was he not? That is true, Judge, but that also happened after the trial of this matter. I'm not guilty afterwards, but what you're asking us to do is to take the word of now of a convicted felon that all of this was above board. I'm also asking you to look at the facts and the evidence at the time that the trial took place. And finding by the trier of fact that your client was not credible. That's true. If he applied the wrong – if all I had was a factual issue and the clearly erroneous standard, I assure you I would not be standing here. Well, I guess the point – I guess the question I'm asking you is, you know, it doesn't look good for the veracity of what your client is saying in the face of a five-day trial where the finder of facts says he's not credible, and then he pleads guilty to fraudulent acts arising from those very same transactions. And now you want us to believe him when he lays it all off on his lawyer. That's a tough argument to make, counsel. It may be, Judge. And I'm not – I am trying to lay it off on the advice of his lawyer. Maybe there's not much of a distinction. I don't think there's a distinction at all here. And I know that it's not in the record, but the reality is that Brendan Retz was basically told, you plead guilty to this and get probation, or we will file 30-some counts against you, and you're going to jail. Well, I think that was probably good advice to him, because based on what I've seen in the record, they could have convicted him of 30 and many more. Well, that was the risk he faced, and he made a choice. But again, I – Do you want to save a minute for rebuttal? Well, I have 58 seconds. I will. Well, like I said earlier, it's a nice day, so add a few seconds. Thank you. All right. Good day. All right, let's – we need a – May it please the Court, counsel. My name is Mike Black, counsel for Donald G. Abbey, one of the creditors of the appellee in this action, appearing today with Edward A. Murphy, also counsel who tried this case with me, and Mr. Talliff. Can I just maybe suggest a shorthand here? Is there anything in the bankruptcy court's 135-page memorandum decision or the BAPS 40-page opinion that you think is wrong and that you would like us to look at with a different view? I don't think there's anything wrong. Certainly, we didn't appeal anything that happened there. Okay. Is there anything that your opposing counsel said this morning that you find particularly troubling that you would like us to consider? Well, there are a couple of points that I want you to consider. How troubling there are, given this record, I don't know how troubling they truly are. In fact, the trial court did find, as a matter of fact, that there was no reliance in good faith on the advice of counsel here. That's at page 116. And I think that legally – What page is it on? Page 116 of the memorandum opinion. And I think that legally, advice of counsel is not a defense. Advice of counsel is something that's considered with respect to all the other evidence, the circumstantial evidence with respect to fraudulent intent and other intent. And you have to determine whether or not there's full disclosure that was made, which the record is also absolutely clear that full disclosure was not made to Mr. Dye. If Mr. Dye used everything that was provided to him, it's absolutely clear from the record and the findings of the trial court that there were substantial deficiencies in the schedules in the Statement of Financial Affairs. And the problem with this entire case is, is whether or not the evidence that was provided to counsel was sufficient to make a good faith effort to avoid the trial that we had four days after – four years after or three years after bankruptcy was filed.  And I think it's also clear from the record that Mr. Dye's counsel told him that he had to amend his schedules. He had to provide the information to the trustees. That was absolutely clear after the first 341 meeting in March of 2004. Nothing was done for a year before these cases were filed. And even if he provided poor advice after the adversary proceeding was filed, it's also clear that the trustee started his own adversary proceeding. That adversary proceeding proceeded to trial before our case went to trial. And as a result of that, that case was stayed to give the debtor an opportunity to amend his schedules. We fully expected prior to trial to get amended schedules, and we're, frankly, surprised that it never happened. So from your perspective, and certainly from the bankruptcy court's perspective, do you believe Mr. Dye, I guess the counsel, performed in every respect in accordance with the regulations and the rules and his ethical obligations, and this was entirely the – Mr. Retz's problem? Well, I don't think I'd go quite that far. I think good-faith reliance has to be in good faith. Right. And when you are presented with a jurat that says, I declare under the penalty of perjury that this is true and correct, and you know that even if all the information you have provided to your counsel were on the schedules that you admit you never read, you can't sign that. I mean, it has to be in good faith. It has to be reasonable under the circumstances. The debtor was not an unintelligent man. He was getting his master's degree in business administration during the course of trial. He's the one who maintained the records. He's the one who was responsible for a lot of the chaos in his own recordkeeping. It's not unlike what all of us face every year when we do our taxes, our deductions and our business expenses. You have to keep track of that stuff. And it shouldn't be like pulling teeth to try and get the information, and it's certainly not the responsibility of the creditors or the trustee to do that. The entire system breaks down if there's not full disclosure and cooperation. So I think the record is clear. I do think it's a clearly erroneous standard. I think the judge spent a great deal of time considering this. I have a couple of questions for you. Yes, sir. So one of the arguments that counsel did advance was that the district of bankruptcy's finding or determination that just a simple filing of the perjured statements themselves was a sufficient basis in which to – was an insufficient basis in which to make the fraudulent finding, doesn't he have a point there? Well, he – as far as it goes. Did he have to rely on that in order to uphold the false oath statement? No. He didn't have to. And – but – and I agree with counsel's point to a certain degree. Once you understand that your – your schedules and statement of financial affairs are incomplete, you have an obligation under Searles to – to move promptly to amend them. It's not just for the people who go to the 341 meeting. We've got creditors who didn't go. That's why you have schedules there on record so they can review them. There was no effort to promptly amend. And that, again, is evidence of – that's probative of the intent with respect to the original jurat. The other thing that I think is important and is probably lost in the record is that the only reason why the issue of failing to read came up was a couple of weeks before trial. That was the defense that was raised. I didn't intentionally mislead anybody because I never read that. Well, that put a whole different spin on this case. I mean, we were well beyond amending the pleadings. The Court did it sua sponte in the – in the memorandum decision to amend the pleadings to include that. But I – but I think it's also important to look at what the Court also said with respect to the 727A4 issue, the false oaths. He says that there are three instances in this record of admitted perjury. That was his finding. You know, and – and the day we were in court and discussed the helicopter testimony at the 341 meeting, I think it's around page 630 of the transcript, there was nobody in that courtroom, I don't think, who didn't believe that Mr. or the debtor had admitted to perjurious testimony at that 341 meeting. That's why it's so important to consider, you know, the demeanor of the witness and defer to the trial court on those types of things. The – even if he were to put aside the false oath determination, there were other grounds on which the Bankruptcy Court relied to deny – to deny dischargeability. Absolutely. Was that 727A2? I mean, it's the Hindersley? Misleading creditors. I'm sorry? Misleading creditors. Yeah. Well, I think there are two areas of fraud. And one was the trustee for a post-petition transaction involving a minority interest in a family closely held corporation. And the other one was with respect to company or property in which Timberland Construction LLC claimed an interest. Both of those, there was substantial evidence there. And I – again, I think that you look at the totality of the evidence, I think it's pretty rare to have a trial that lasts five days in this sort of situation. But one of the reasons why it did is just there was just the need to provide the circumstantial evidence and to go through all of the documents, you know, that we had to extract to try and figure out what was going on that shouldn't have been our job. And the last reason for the denial of discharge is clearly a factual question, and that's under 727A5, the failure to explain. There's no intent requirement there. And, you know, I think that that's basically where the BAP threw up their hands at the end of their opinion and said, you know, I mean, how can we, you know, reverse under 727A5? There's just no explanation occurring. So, you know, unless the panel has additional questions, I don't think I have much more to add. I don't. Thank you, Your Honor. Thank you very much, counsel. Minute for rebuttal. Justice Talmadge, I was not able to find that portion of the transcript. I'm sorry. I didn't bring it with me. That's okay. We can – we've got it. We can take it with us. With respect to the question, I'm going to go back to intent. And on page 115 of Judge Kershaw's decision, again, he says that notwithstanding some concern raised by being nervous that Brendan pressured his wife to sign the schedules and statements, and based on that alone, he acted knowingly and fraudulently. I guess it's up to the judge to characterize that as pressuring his wife. If you read the transcript, you will see that Misty raised an issue of these are blank, Brendan. Why should we sign them? And his response was because they will contain the information we've given Mr. Dye and have been sending to him. So what we've been giving him should be on there and it should be fine. That, again, goes to intent. With respect to the last issue about – I'm not sure. I'm looking at 115. Isn't that what the Court said? I'm sorry. Isn't that what the Court said? I mean, he says the evidence shows that Misty expressed her concern to Brendan that they had not seen the schedules and statements. Brendan himself testified he was a little bit more nervous about listing something under penalty of perjury than he would be estimating income for borrowing purposes. But notwithstanding, Brendan pressured Misty to sign her declarations despite her concerns, and he signed his declarations knowing that they were not complete, true, and correct, but stating that they were. Well, that's what the opinion says. But how is that inconsistent with what you just said? I'm saying that that's not what the transcript shows. That she wasn't concerned about signing schedules? She was concerned. She was testifying under penalty of perjury? No. The transcript does say that. She raised some concerns, but it doesn't show that Brendan pressured her, and it also shows that he said, again, going to his intent, that the schedules and statements will have the information that we believed we'd been giving to Mr. Dye. I guess what I don't understand is why can't a reasonable finder of fact infer from Misty's testimony, notwithstanding the fact that she's the wife, that she didn't feel very comfortable signing things in blank, to which she was swearing they were true under penalty of perjury? I will concede that. Someone could find that, Judge. And then lastly, with respect to the inability to explain loss of property, I would just raise the question, what property was not disclosed or was shown to have been lost or destroyed? The only property that I'm aware of that was not talked about, adequately explained to the trustee and the creditors, was the gambling debt, which was listed on the schedule that- Well, he couldn't explain what happened to the $50,000 that he ran up on his Wells Fargo credit card after he petitioned in bankruptcy and then posted property that wasn't his own, as collateral. That that money went into TC? My reading of the transcript was, well, some of it went into TC. Here, some went there and- That's true, but- $50,000, you know, it's pocket change. There were records that did explain it. I understand the judge didn't accept that. All right. Thank you. Anyway, thank you. We'll let you go over your time. All right. Thank you. Thank you. Retz v. Samson is submitted.
judges: Paez, Tallman, Smith M.